UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
TYCO INTERNATIONAL LTD.,                :
                       Plaintiff,       :
                                        :      02 Civ. 4633 (DLC)
                                        :
             -v-                        :      OPINION & ORDER
                                        :
                                        :
FRANK E. WALSH, JR.,                    :
                       Defendant.       :
                                        :
----------------------------------------X

Appearances:

For Plaintiff:
Mark Levine
Bartlit Beck Herman Palenchar & Scott LLP
54 W. Hubbard Street, Suite 300
Chicago, IL 60654

Bryan Leach
Bartlit Beck Herman Palenchar & Scott LLP
1899 Wynkoop Street, 8th Floor
Denver, CO 80202

Brian Pumphrey
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219

For Defendant:
Michele L. Pahmer
Jeremy Rosof
Elizabeth Cronise
Rodger Pichardo
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

DENISE COTE, District Judge:

This action arises from a dispute concerning a corporation's payment of a so-called "finder's fee" to its lead outside director for his role in facilitating a merger.  In July 2001, L. Dennis Kozlowski ("Kozlowski"), the Chief Executive Officer of plaintiff Tyco International, Ltd. ("Tyco"), paid Tyco's director, defendant Frank E. Walsh, Jr. ("Walsh"), a $20 million fee in connection with Tyco's acquisition of CIT Group, Inc. ("CIT").  Tyco's board first became aware of the payment to Walsh in January of 2002.  Tyco eventually brought suit against Walsh, alleging that he breached his fiduciary duty to the board by failing to disclose the payment.  Shortly thereafter, Walsh pleaded guilty to a violation of New York's Martin Act and returned the $20 million to Tyco.

Tyco now seeks recovery of interest on the $20 million payment to Walsh and consequential and punitive damages.  A bench trial was held October 12-13, 2010.  This Opinion presents the Court's findings of fact and concludes that although Walsh breached his fiduciary duty to Tyco by failing to timely disclose the $20 million payment, Tyco's board implicitly ratified the payment through its public actions and statements in the period immediately following disclosure of the payment to the board.

Procedural History

On June 17, 2002, Tyco filed this action against Walsh, asserting claims for restitution, breach of fiduciary duty, conversion, unjust enrichment, constructive trust, and inducing breach of fiduciary duty.  This case returned to this Court for trial in 2010, following the completion of proceedings before the Multi-District Litigation court.

The bench trial was conducted, without objection, in accordance with this Court's customary practices for the conduct of non-jury proceedings.  On September 17, 2010, the parties submitted a Joint Pretrial Order and proposed findings of fact and conclusions of law.  The parties also served affidavits containing the direct testimony of their witnesses and copies of all the exhibits and deposition testimony that they intended to offer as evidence in their case in chief at trial.

Tyco presented affidavits constituting the direct testimony of David Boies ("Boies"), a lawyer at the firm Boies Schiller & Flexner LLP ("Boies Schiller") which served as outside counsel to Tyco; Elizabeth Edwards ("Edwards"), a lawyer at the firm McGuireWoods LLP which represented Tyco in the Franklin litigation; and John Jenkins ("Jenkins"), the Vice President, Corporate Secretary, and International Counsel of Tyco.

Walsh presented affidavits constituting the direct testimony of Andrew Martin ("Martin"), a partner in the Bermuda law firm of Mello Jones & Martin; and Walsh himself.

Excerpts from the depositions of some of the testifying witnesses, as well as the following individuals, were offered and received into evidence at trial.  The parties offered excerpts from the depositions of the following former Tyco directors:  Michael Ashcroft ("Ashcroft"); Joshua Berman ("Berman"); Richard Bodman ("Bodman"); John Fort ("Fort"); Stephen Foss ("Foss"); Wendy Lane ("Lane"); James Pasman ("Pasman"); W. Peter Slusser ("Slusser"); Mark Swartz ("Swartz"), Tyco's former Chief Financial Officer; Kozlowski, the former President and Chief Executive Officer of Tyco and Chairman of the Board; and Joseph Welch ("Welch").  The parties also offered the depositions of former Tyco Chief Counsel Mark Belnick ("Belnick") and Tyco in-house counsel Fatemah Sadeghi-Nejad ("Sadeghi-Nejad"), as well as the deposition of Meredith Cross ("Cross"), outside counsel to Tyco at the firm Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Cutler").  The parties also offered the depositions of the following Tyco employees:  Jackson Blackstock ("Blackstock"), a former analyst; Mark Foley ("Foley"), senior vice president of finance; Maryanne Kane ("Kane"), former Chief Communications Officer; Kevin MacKay ("MacKay"), a vice president and assistant controller; Kathy

Manning ("Manning"), former senior vice president of investor relations; Jeffrey Mattfolk ("Mattfolk"), senior vice president of business development; Bradley McGee ("McGee"), a manager of business analysis; Patricia Prue ("Prue"), a senior vice president of human resources; and Michael Robinson ("Robinson"), a treasurer.  The parties offered the testimony of CIT employees Albert Gamper, Jr. ("Gamper"), the former Chief Executive; and William Taylor ("Taylor"), a former controller.  The parties also offered the testimony of the following auditors at PricewaterhouseCoopers:  Kevin Burney ("Burney"), Dustin Minton ("Minton"), and Christa Dewire ("Dewire").

On October 4, this Court denied Tyco's motions in limine to exclude the testimony of Martin, an expert in Bermuda law, and to exclude evidence of Walsh's reliance on counsel.  The Court granted in part Tyco's motion to exclude testimony related to compensation received by other Tyco directors.  Also on October 4, the Court denied Walsh's motion to preclude evidence of damages associated with an investigation conducted by Boies Schiller and the Franklin litigation.

The Court also ruled on October 10 that Tyco would not be entitled to punitive damages.  The adoption of Bermuda law, for the reasons described below, precludes any award of punitive damages.  Following the Court's ruling, Tyco withdrew Jenkins'

affidavit, as it related solely to the issue of punitive damages.

The following constitutes the Court's findings of fact and conclusions of law in this case. While many of the findings of fact appear in the next section of this Opinion, additional findings appear later in the Opinion as well.

Findings of Fact

Plaintiff Tyco is a corporation engaged in manufacturing and services. It had been a New Hampshire corporation until 1997, when it became a Bermuda corporation through a reverse merger with another corporation. In its Form 10-K filed on December 28, 2001, Tyco listed the location of its principal executive office as Bermuda. Defendant Walsh, a former investment banker, served on Tyco's board of directors from 1992 to 2002. Walsh was appointed Lead Director in January 2001. The appointment of Lead Director conferred the responsibility for helping to coordinate the agenda of board meetings, the nomination of new directors, and the board's review of the performance of the Chairman. Walsh also served on Tyco's Compensation Committee from 1997 to 2000 and its Corporate Governance and Nominating Committee in 2001.

Walsh introduces Tyco and CIT

In late 2000, Walsh became aware that Tyco was interested in acquiring a financial services company and suggested that Tyco consider acquiring CIT.  After Tyco expressed interest in CIT, Walsh arranged for a meeting between Kozlowski and Gamper, whom Walsh knew.  The meeting took place at the Park Avenue Club in Florham Park, New Jersey.  After the initial meeting between Kozlowski and Gamper, Kozlowski thanked Walsh for his assistance and mentioned that Walsh could receive a finder's fee for his services if the transaction were successfully consummated.  The two men agreed to discuss the matter further in the event Tyco succeeded in acquiring CIT.

In 2001, two provisions of Tyco's Bye-Laws addressed the performance of special duties undertaken by directors for the benefit of Tyco.  In the section of the Bye-Laws addressed to "Directors' interests," the Bye-Laws provided that "<u>Any Director may act by himself</u> or his firm <u>in a professional capacity for the Company</u>, <u>and</u> he or his firm shall <u>be entitled to remuneration for professional services as if he were not a Director</u>, provided that nothing herein contained shall authorise a Director or his firm to act as Auditor to the Company."  (Emphasis supplied.)  Later, in a section entitled "Remuneration of Directors," the Bye-Laws provided that

The Directors may grant special remuneration to any Director who, being called upon, shall perform any special or extra services for or at the request of the Company. Such special remuneration may be made payable to such Director in addition to or in substitution for his ordinary remuneration (if any) as a Director, and may be made payable by a lump sum or by way of a salary, or commission on the dividends or profits of the Company or of any other company in which the Company is interested or other participation in any such profits or otherwise, or by any or all or partly by one and partly by another or other of those modes.

(Emphasis supplied.)

Tyco's Bye-Laws also required directors to disclose conflicts of interest to the board:

A Director who to his knowledge is in any way, whether directly or indirectly, interested in a contract or arrangement or proposed contract or arrangement with the Company shall declare the nature of his interest at the meeting of the Directors at which the question of entering into the contract or arrangement is first taken into consideration, if he knows his interest then exists, or in any other case at the first meeting of the Directors after he knows that he is or has become so interested. A general notice to the Directors given by a Director to the effect that he is a member of a specified company or firm and is to be regarded as interested in any contract or arrangement which may after the date of the notice be made with such company or firm shall be sufficient declaration of interest under this Bye-Law in relation to any contract or arrangement so made; provided that no such notice shall be effective unless either it is given at a meeting of the Directors or the Director giving the same takes reasonable steps to secure that it is brought up and read at the next meeting of the Directors after it is given.

(Emphasis supplied.)

Tyco Acquires CIT

Tyco's board voted on the acquisition of CIT during its March 12, 2001 meeting in Bermuda.  After Kozlowski explained the terms of the proposed merger, the board unanimously ratified the transaction.  Walsh was not present at the meeting.[1] Kozlowski did not inform the board that any compensation was owed or would be paid to Walsh.

In the Agreement and Plan of Merger for the $9.5 billion acquisition of CIT, dated March 12, 2001, Tyco represented that, with the exception of its investment bankers Lehman Brothers and Goldman, Sachs & Co., "there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of [Tyco] who might be entitled to any fee or commission from [Tyco] . . . in connection with the transactions contemplated by this Agreement."  The Agreement was incorporated by reference and attached to the registration statement on Form S-4 that Tyco filed with the Securities and Exchange Commission ("SEC") on March 29, 2001.  Walsh signed the registration statement in his capacity as a director of Tyco.

---

[1] Walsh stated in his plea allocution that he had been present at the board meeting and had voted in favor of the merger with CIT. The board minutes indicate, however, that Walsh was not present. Walsh had attended a prior meeting of the board in which he endorsed the acquisition of CIT without disclosing that he stood to gain a payment for assisting in the acquisition.

Walsh Requests and Receives $20 million

After the closing of the CIT transaction in early June 2001, Walsh and Kozlowski again discussed Walsh receiving a fee for introducing CIT and Tyco.  As they were negotiating a fee of $20 million, Kozlowski told Walsh that he hoped to avoid making any payment to Walsh over $15 million, since a payment of that size would have to be disclosed publicly.  Ultimately, on July 18, Walsh submitted an invoice for $10 million for "investment banking services" rendered in connection with the CIT acquisition.  The cover letter attaching the invoice was addressed to Swartz in Florida, although the invoice itself was addressed to Tyco's New York office and it was faxed to Swartz at a New York telephone number.  The invoice was paid out of the Pittsburgh, Pennsylvania bank account of Tyco Acquisition Corp., a Tyco subsidiary based in Boca Raton, Florida.  In a letter of July 25, addressed to Swartz in Florida although again faxed to a New York number, Walsh thanked Tyco for agreeing to contribute $10 million to a charity selected by him, and designated the Community Foundation of New Jersey ("Community Foundation") as the charity.  Walsh advised the Community Foundation on its investment and distribution of the $10 million it received from Tyco.  Tyco recorded the entire $20 million payment on its books as a cost related to the acquisition of CIT.  It also received a

receipt from the Community Foundation for use in claiming the $10 million donation as a charitable contribution.

During the negotiation of the fee in July, Kozlowski had asked Walsh not to discuss the fee with anyone other than Swartz and Kozlowski.  Walsh had not mentioned his expectation of a fee during the board's discussion of the CIT transaction and he did not advise his fellow directors about it at the board meeting he attended in October.  Nonetheless, at the end of the year, on December 21, 2001, Walsh filled out a Directors' and Officers' Questionnaire ("D&O Questionnaire") in connection with the preparation of proxy materials for a shareholders meeting.  In the questionnaire, Walsh disclosed his receipt of the $20 million fee, stating:

> In connection with the acquisition of CIT Corporation, Tyco paid me a fee of $10 million for Investment Banking Services rendered.  At my request, Tyco contributed $10 million to The Community Foundation of New Jersey, a public charity, and I was given the authority to recommend to the Foundation how the funds would be disbursed to appropriate charitable causes.

Walsh forwarded the questionnaire to Swartz and advised members of Tyco's legal department that he had done so.  Tyco's Form 10-K for the fiscal year ending September 30, 2001, filed with the SEC on December 28, did not disclose the $20 million payment.

January 16, 2002 Board Discussion of Tyco Payment to Walsh

Walsh's decision to disclose the $20 million payment on his
D&O Questionnaire began a chain reaction of disclosures within
the company that culminated in the disclosure of the payment to
Tyco's board and then to the public.  Before the board meeting
in which the payment was disclosed, however, Kozlowski asked
Walsh to return the fee.  Walsh refused.  Aware that at least
some board members wanted him to repay the fee, Walsh consulted
an attorney in advance of the Tyco board meeting.

The first time the board discussed the $20 million payment
to Walsh was during a board huddle in Boca Raton, Florida on
January 16, 2002, held on the eve of a formal board meeting
scheduled to take place in Bermuda.[2]  The huddle was described in
an itinerary prepared for the directors as a "board of
directors' business review."  The main topic of discussion at
the huddle was a proposal put forth by Kozlowski to separate
Tyco into four independent, publicly traded companies, using the
proceeds from the initial public offerings to pay down Tyco's
debt.  Walsh participated in the board's discussion of the
break-up proposal and other issues, which lasted several hours.

---

[2] A board huddle is a meeting of the board held to discuss
informally matters that will be presented at formal board
meetings.  Although Tyco prepared agendas for the huddles, there
is no evidence that it prepared minutes for the huddles.

Near the end of the huddle, the board took up the issue of
the $20 million payment to Walsh for his role in Tyco's
acquisition of CIT.  During its initial discussion of the
payment, the Board told Walsh to return the payment and advised
him that if he refused, he would not be renominated to the
Board.  Walsh refused to return the payment, referring to a
letter dated January 15, 2002 that he had received from James R.
Tannenbaum at Stroock & Stroock & Lavan LLP in support of his
position that he was entitled to the payment,[3] and walked out,
bidding his fellow directors "adios."

After Walsh left the meeting, the remaining directors
agreed that Walsh would not be renominated to the board.  Many
board members were deeply distressed to learn that a payment of
this magnitude had been made by Kozlowski to a director, but the
board took no other steps at the meeting either to ratify the
payment or to seek its return.  The decision to take no further
steps to get Walsh to repay the money can be attributed
principally to two factors.  First, there was confusion among
the directors as to whether Kozlowski had the authority to

---

[3] The letter stated that "there is neither any provision of
Bermuda law known to us, nor any provision of Tyco's Memorandum
of Association and Bye-Laws, which would in any way limit the
ability of Tyco to pay you . . . an investment banking fee or
finder's fee in connection with the acquisition [of CIT]."  The
letter went on to note that "a cursory review of our database
has identified a number of instances in which finder's fees have
been paid to a director in connection with an acquisition."

approve the $20 million payment to Walsh.  Second, Kozlowski essentially made the payment a referendum on him.  He told the board that if it challenged Walsh's right to keep the payment, it was challenging him.  In effect, Kozlowski gave the board the option to remove him as Chief Executive Officer, and it declined to do so.  In presenting this ultimatum, Kozlowski was well aware that Tyco's board would be particularly reluctant to remove him at a time when Tyco was facing serious challenges and as the board was considering and Tyco was likely to embark upon a major restructuring of the company.  As of January 16, the board still had great confidence in Kozlowski's leadership of Tyco, and therefore the board chose not to pursue the issue of the payment to Walsh any further.  The day after the board huddle, Kozlowski reported to Walsh that "the board finally came around" on the issue of the payment.

A special meeting of the board held in Bermuda on January 20 addressed the Kozlowski proposal to break up the company into four separate companies that had been presented at the January 16 board huddle.  The board unanimously approved the plan.  The board took no action whatsoever regarding the payment to Walsh, and the Walsh payment is not mentioned in the minutes of the January 20 meeting.

Tyco promptly disclosed the $20 million payment to Walsh in its January 28, 2002 proxy statement, prepared for Tyco's annual

shareholders meeting.  Kozlowski's cover letter to the proxy

statement drew shareholders' attention to the plan Tyco had

announced on January 22 to separate itself into four

independent, publicly traded companies.  Within the proxy

statement, under the section titled "Related Party

Transactions," the payment to Walsh was described in a passage

which reads in its entirety as follows:

> Mr. Walsh, a director, was instrumental in bringing about
> the acquisition by a subsidiary of the Company of The CIT
> Group, Inc. (now Tyco Capital Corporation) of Livingston,
> New Jersey.  <u>For his services, Tyco paid Mr. Walsh a fee of
> $10 million</u>.  In addition, <u>at Mr. Walsh's request, Tyco
> contributed $10 million to a charitable fund</u> established
> under The Community Foundation of New Jersey.  Mr. Walsh,
> as trustee of this fund, recommends the public charities to
> which contributions are made.  At the time of the
> acquisition, Mr. Walsh owned 50,000 shares of common stock
> of The CIT Group, Inc., which were converted to 34,535 Tyco
> common shares at the exchange ratio applicable to all
> stockholders of CIT.[4]

(Emphasis supplied).  Berman, a Tyco director and employee, who

had been appalled to learn of the payment to Walsh, reviewed and

approved this disclosure.  Berman was a corporate securities

attorney, had practiced law at a major New York law firm before

joining Tyco in 2000, and had been present at the January 16

meeting.

---

[4] The proxy statement mistakenly stated that Walsh owned shares
in CIT prior to the public announcement of the merger.  Walsh
did purchase CIT shares and exchange those shares for Tyco stock
at the time the merger was consummated.  The proxy statement
also mistakenly described Walsh as a trustee of the charitable
fund; Walsh was an advisor to the fund.

The Response to the Public Disclosure of the $20 Million Payment

The market reaction to the Tyco break-up proposal had been severely critical.  Similarly, the press and corporate-governance experts were highly critical of the Tyco payment to a director for his work in brokering an acquisition.  In response, Tyco chose to defend the payment.  A January 29 Wall Street Journal article reported that "Tyco spokeswoman Maryanne Kane said Tyco's board decided, without any outside help, that the $20 million payment was 'appropriate based on the amount of work' Mr. Walsh did, which she said included providing guidance, advice and facilitating meetings."  On the same day, Tyco released a statement which quoted Kozlowski as saying that the payment of the fee had been "fully disclosed" in Tyco's proxy statement, that the fee was paid because Walsh had been "instrumental in bringing about" the $9.2 billion acquisition of CIT, and that the payments of a $10 million fee and a $10 million charitable contribution were made for the "services" that Walsh had performed.  Kozlowski added, "'The Board felt that [the] fee was appropriate in light of Mr. Walsh's efforts.'"  Referring to the post-Enron business environment, Kozlowski acknowledged that "we are in an environment where people are intensely skeptical of corporate America, and for

that matter of Tyco."  The press release had been thoroughly vetted and heavily edited before Tyco issued it.

Several board members remember being unhappy with the press coverage of the Walsh payment.  Berman recalls telephoning Kozlowski and inquiring, "what's this in the Wall Street Journal about the board felt the amount of the fee was appropriate[?]"  As a result of the controversy, Kozlowski asked Belnick, who had not attended the board's discussion of the Walsh payment during the January 16 huddle, to speak with the directors about Tyco's treatment of the Walsh payment in its statements to the press.[5]

Belnick got as many of the directors as possible on the telephone for a conference call.  The participants included Berman, Bodman, Pasman, Kane, and others.  Bodman and other directors expressed their "great displeasure" at Tyco's statements to the press, particularly the statement that the board felt the payment to Walsh was "appropriate."  Belnick reminded the directors that he had not been present during the board's discussion of the payment, but that based on what Kozlowski and Swartz had told him of the discussion, and from his work with Berman on the proxy statement, he understood that the board had "ratified" or "approved" the payment.  Belnick emphasized repeatedly that the act of ratifying or approving the

---

[5] At the time, Kozlowski was "on the road" trying to win support for the Tyco break-up plan.

payment implied a judgment that the payment was "appropriate."
At no point during the call did any director correct Belnick and
advise him that the board had not ratified or approved the
payment.  To the contrary, when Belnick explained that the board
had many options, such as firing Kozlowski, filing suit, or
setting up an independent committee to inquire and advise the
board, Bodman disagreed, explaining "it was a fait accompli,
what else could we do."

    In a February telephone call between Belnick and Berman,
Belnick pressed Berman to get him the minutes from the January
16 meeting reflecting the ratification so that Tyco would have
back-up for the disclosure made in the proxy statement.
Alternatively, he asked Berman to get a board resolution
ratifying the Walsh payment.  Berman adamantly refused and
explained, to Belnick's surprise, that the board had not
actually ratified the payment.  Belnick pressed Berman,
observing that the only reasonable interpretation of the January
28 proxy statement was that the board had in fact approved the
payment to Walsh.  Berman pointed out that a recent inquiry from
the SEC conveyed that the SEC had also understood the proxy
disclosure of the Walsh payment to indicate that the board had
approved the payment.  The SEC's inquiry had asked, inter alia,
that Tyco "address the factors that the board considered in
arriving at the aggregate figure of $20 million."  Berman denied

that that was what the disclosure meant.  Berman explained that
he was simply "trying to steer a middle course" in which "the
Board just doesn't ratify, doesn't not ratify."

Also in February 2002, at Belnick's request, Tyco's outside
counsel Wilmer Cutler prepared a chronology describing the
company's handling of the Walsh payment.  An email dated
February 19, sent to Belnick from Cross at Wilmer Cutler,
attached the chronology as well as a summary of other public
transactions in which directors had received finder's fees.  The
Cross email stated that the "attached chronology shows that
various news sources and the SEC believe that the Tyco board
approved the Walsh payment."  Email correspondence between
Wilmer Cutler and Belnick in March 2002 reflects that Belnick
reviewed the chronology and that his revisions were incorporated
into the document.[6]

During this same time period, Tyco received at least two
inquiries from shareholders relating to the Walsh payment.  One
letter observed that "this transaction[] should have been given
to a non fiduciary to complete" and requested that "the company
seek to recover the Walsh payments for the benefit of the
company."  Another shareholder wrote that he was "outraged" to

---

[6] Even though Belnick revised the chronology so that it would
conform to his understanding of events, this Opinion has not
based its findings of fact on the description of events
contained in the chronology.

read of the Walsh payment in the <u>Wall Street Journal</u>.  The same
letter also noted that in a "very short period of time, my
investment in Tyco has decreased in value by almost 50
[percent]."  The shareholder warned that he was sending a copy
of his letter to the SEC and his U.S. Senators.  Swartz's
response to this letter on behalf of Tyco, dated March 19, 2002,
gives no indication that the company was seeking to recover the
payment.  Instead, it lists Walsh's contributions to the CIT
transaction, noting that "Mr. Walsh originated the idea that
Tyco acquire a finance company" and that prior to Walsh's
involvement, "there had been no indication that CIT management
was receptive to the idea of CIT being acquired . . . ."

At its February 20 board meeting, the board discussed a
shareholder demand letter regarding the Walsh payment and
referred the matter to its Corporate Governance Committee.  The
board also passed a resolution amending the Bye-Laws to provide
that "no independent director shall receive any payment for
services rendered to, for or at the request of the Company other
than the director's fees received for his or her services as a
director and the reimbursement of out-of-pocket expenses
incurred in performing services as a director."

Meanwhile, a February 11, 2002 <u>Barron's</u> article noted that
the announcement of the break-up had unleashed a "firestorm" of
"rumors and innuendo" surrounding the company.  The article

reported that "[o]ver the past two weeks, Kozlowski has been accused of everything from self-dealing for having 'dumped' $70 million of Tyco stock at higher prices in the last fiscal year to cronyism for having allowed outside director Frank Walsh to garner a $20 million fee from Tyco for helping engineer the company's $9 billion takeover of the finance company CIT last year."  The article quoted Kozlowski as acknowledging that the Walsh payment was "'inappropriate'" and noting that "'[a]fter the situation arose, the board unanimously voted to change our bylaws so such a situation would never again arise.'" [7]

Also on February 11, Walsh released a statement to the Wall Street Journal about his role in the CIT transaction.  The statement was released following coordination with Tyco and with its prior approval.  The statement noted that the "implicit trust both [Gamper and Kozlowski] had in Mr. Walsh's judgment and integrity acted as a catalyst and accelerated the negotiations leading to Tyco's successful offer for CIT Group."  The statement went on to explain that Kozlowski and Walsh had had "a cordial, businesslike, and definitive discussion about how to structure compensating Mr. Walsh for his role" in the CIT acquisition after the merger was consummated.  The statement concluded by noting that "further questions about discussions

---

[7] There is no evidence in the board minutes that this vote occurred before February 20.

between Mr. Kozlowski and Mr. Walsh should be referred to the company."

In an April 2 response to a February 12 inquiry from the SEC regarding Tyco's failure to disclose the payment and whether Walsh had voted on the CIT acquisition in its 10-K,[8] Tyco responded that the payment was included as a cost related to the CIT acquisition and that Tyco did not include a separate discussion of the payment because "we believe that $20 million is not material to our Consolidated Financial Statements."  Tyco inadvertently advised the SEC that Walsh had "voted" on the CIT acquisition.  The Tyco response did not advise the SEC of any position taken by the board vis-à-vis the payment, despite the SEC request recited above that Tyco address the factors that the board considered in arriving at the amount of the payment.  It simply listed the factors that Kozlowski considered in determining the amount of the payment, noting that it represented approximately two tenths of one percent of the total transaction value.  The SEC responded on May 13, 2002 that it "continued to believe" that Tyco needed to revise its treatment of the $20 million payment and include it as a related party transaction.

---

[8] The February 12 SEC inquiry was addressed to Tyco's December 28, 2001 Form 10-K and the January 28, 2002 Proxy Statement.  It included scores of questions, two of which concerned the Walsh payment.

Boies Schiller Retention

On April 29, at a meeting held by telephone conference, the Corporate Governance Committee decided to recommend to the board that action be taken to recover the $20 million payment.[9]  It expected to supervise any lawsuit that "would be brought."  The Committee also resolved to "conduct a review . . . of the Company's corporate expenditures" and to "ask L. D. Kozlowski and M. H. Swartz for all information concerning their transactions (and those of affiliates) in the Company's shares." The committee promptly retained the law firm Boies Schiller to conduct an investigation into the payment to Walsh and make appropriate recommendations regarding corporate governance.  It asked Boies Schiller to complete that investigation in roughly six weeks.  The retention letter, dated May 17, however, gave Boies Schiller a broader mandate.  It explains that Tyco retained the firm "in connection with the Committee's review and analysis of transactions between and among Tyco and its subsidiaries and certain of Tyco's directors and officers, and any litigation arising from or relating to that review and analysis . . . ."

---

[9] The members of the committee were Ashcroft, Berman, Bodman and Fort.

During May, Tyco's General Counsel Belnick had advised
Boies that he did not believe that a lawsuit by Tyco against
Walsh "was in the company's best interest."  Tyco's position
changed in June.  On June 1, Tyco's board and Boies learned that
Kozlowski was being criminally investigated for a tax-related
offense.  Before that date, the only board members who were
aware that the District Attorney of New York County was
investigating Kozlowski were Swartz and Kozlowski himself.
Kozlowski resigned early in the morning of June 3.  With the
departure of Kozlowski and Belnick, the board asked Boies
Schiller for the first time to recommend whether litigation
should be pursued "as a means of recovering the Walsh payment."
At its June 3 meeting held by telephone conference, the board
resolved to investigate all transactions between Tyco and its
senior management, including Kozlowski.

Tyco paid Boies Schiller a $250,000 retainer.  The law
firm's representation of Tyco during May was entirely related to
its investigation into the $20 million payment to Walsh.  On
June 1, Boies Schiller expanded the scope of its representation
of Tyco.  The law firm estimates that legal fees attributable to
the Walsh investigation for May and June 2002 are in the range
of $495,901, which represents the sum of the retainer fee, the

fees of $193,198 for work in May, and conservatively five percent of the June 2002 fees, an amount equal to $52,703.[10]

Criminal Proceedings

Kozlowski was indicted in New York State court in June 2002 and resigned from all of his positions in the company shortly thereafter.[11]  On December 17, 2002, Walsh pleaded guilty in New York State court to a violation of General Business Law § 352(c)(6).  Walsh allocuted that at the time Tyco's board was considering the proposed acquisition of CIT and preparing to vote on the transaction, he "intentionally did not disclose to any of the members of the Board, other than Kozlowski and Swartz, that [he] stood to receive a substantial fee if the transaction was approved."  Walsh also advised the court that

> following the Board's approval [of the CIT merger],
> a securities filing was done by Tyco in which the
> company omitted to disclose that I was to get a fee.
> That made the filing false.  Thereafter, I reached
> an agreement with L. Dennis Kozlowski that I would
> receive a ten million dollar fee for my services,
> and Tyco would further contribute ten million
> dollars to a charity recommended by me.

---

[10] While Boies estimates that five to fifteen percent of the June time is attributable to the Walsh investigation, Tyco seeks only 5% of the fees.

[11] Kozlowski and Swartz were subsequently convicted at trial of grand larceny and violations of New York's Martin Act for authorizing over $100 million in "bonuses" from Tyco's treasury. See People v. Kozlowski, 846 N.Y.S.2d 44, 50 (App. Div. 2007).

A plea agreement required Walsh to pay Tyco restitution of $20 million, which he did on the same day.  Walsh also paid $2.5 million to the State and City of New York and $250,000 to the New York District Attorney's Office in lieu of fines.

The interest on the $10 million cash payment between its receipt by Walsh on July 19, 2001 and his repayment to Tyco on December 17, 2002, if calculated using New York's statutory rate of 9%, is $1,272,328.77.  The interest on the $10 million contribution to the Community Foundation, between its delivery on July 30, 2001 and Walsh's repayment to Tyco on December 17, 2002 is $1,245,205.48, resulting in a total amount of interest as of December 17, 2002 of $2,517,534.22.  The interest that would have accumulated between December 17, 2002 and October 5, 2010 on the $2,517,534.22 figure is $1,768,550.56.  These figures total $4,286,084.81.

If calculated using Bermuda's statutory rate of 7%, the interest on the $10 million cash payment between its receipt by Walsh on July 19, 2001 and his repayment to Tyco on December 17, 2002 is $989,589.04.  The interest on the $10 million charitable contribution from July 30, 2001 to December 17, 2002 is $968,493.15, resulting in a total amount of interest as of December 17, 2002 of $1,958,082.19.  The interest that would have accumulated between December 17, 2002 and October 5, 2010

on the $1,958,082.19 figure is $1,069,863.92.  These figures
total $3,027,946.11.

     Walsh also entered into a consent judgment with the SEC on
December 13, 2002.  The consent judgment ordered restitution of
the $20 million payment, which was deemed satisfied by the
restitution Walsh paid in the New York criminal case.


Private Civil Litigation

     Tyco's stock dropped precipitously in the period after Tyco
announced its break-up plan and disclosed the $20 million
payment to Walsh in its annual proxy statement.  Numerous
lawsuits were filed against Tyco, its officers and directors,
and its outside auditor PricewaterhouseCoopers LLP.  The
securities class action lawsuits were consolidated in the
District of New Hampshire and a consolidated class action
complaint was filed on January 28, 2003.  The consolidated
complaint alleged that Tyco's senior management "failed to
disclose and falsely denied the falsification of Tyco's
financial reporting, reported acquisition costs, and the
purported success of its acquisition strategy.  Defendants also
failed to disclose the looting of the Company by its senior
executives who were conducting Tyco as a criminal enterprise."
The complaint treats Tyco's statements regarding the payment to
Walsh as part of a general pattern of misleading and false

disclosures of the company's finances.  On May 30, 2007, Tyco paid $2.975 billion to settle the consolidated securities class action.

After the consolidated securities class action was settled, seven opt-out suits were filed over a period of months, including Franklin Mutual Advisers, LLC v. Tyco International Ltd., No. 07-4575-B (D. N.H. filed September 24, 2007)(the "Franklin litigation"), which largely reiterated the allegations in the consolidated complaint.  Tyco calculates that it incurred $336,483.24 in attorneys' fees in connection with the Franklin litigation.


Conclusions of Law

Tyco asserts claims of restitution, breach of fiduciary duty, conversion, unjust enrichment, constructive trust, and inducing breach of fiduciary duty against Walsh.  To resolve Tyco's claims, it is necessary to first address the issue of choice of law.


Choice of Law

The parties disagree as to the governing law in this case. Walsh argues that Bermuda law governs Tyco's claims, while Tyco

contends that New York law applies.[12]

In cases where jurisdiction is based on the diversity of citizenship of the parties, a federal court will apply the choice-of-law rules of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Bakalar v. Vavra, No. 08-5119-cv, 2010 WL 3435375, at *2 (2d Cir. Sept. 2, 2010).  In New York, the forum state in this case, the choice-of-law analysis generally begins with a threshold determination as to whether an actual conflict of laws exists.  GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc., 449 F.3d 377, 382 (2d. Cir. 2006) (quoting Schulz v. Boy Scouts of America, Inc., 65 N.Y.2d 189, 197 (1985)).  The choice of law analysis must be conducted separately for each claim.  Id. at 383.  Where an actual conflict of laws exists, New York applies an "interest analysis" to determine which jurisdiction's laws will apply to tort claims.  Id. at 384.  The "interest analysis" provides that "'the law of the jurisdiction having the greatest interest in the litigation will be applied and the only facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.'" Id. (citation omitted).  Where the conflict is over a law that regulates conduct, such as rules of the road, "the law of the

---

[12] Tyco has not briefed or argued that the law of a state other than New York, such as New Hampshire or Florida, should apply here.

jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating conduct within its borders."  Id. (citation omitted).

In cases involving the fiduciary duties of a foreign corporation's directors, however, New York courts typically will apply the law of the state of incorporation under the "internal affairs" doctrine.  See, e.g., Hausman v. Buckley, 299 F.2d 696, 703 (2d Cir. 1962).  The doctrine recognizes the state of incorporation's "authority to regulate a corporation's internal affairs -- matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders -- because otherwise a corporation could be faced with conflicting demands."  Edgar v. Mite Corp., 457 U.S. 624, 645 (1982).  Although the doctrine generally governs choice-of-law in suits involving the duties of shareholders or directors, the New York Court of Appeals has rejected an "automatic application" of the internal affairs rule.  Greenspun v. Lindley, 36 N.Y.2d 473, 478 (1975).  The law of a state other than the state of incorporation may be applied if there are significant contacts with that state.  Id.

Breach of Fiduciary Duty Applying Bermuda Law

Bermuda's substantive law applies to Tyco's breach of fiduciary duty claim against Walsh.  Tyco is a Bermuda

30

corporation, and there is no reason in this case not to follow New York's internal affairs doctrine, which typically applies the law of the state of incorporation to claims involving a director's duties to the corporation.  Indeed, activities central to Tyco's claim of breach of fiduciary duty occurred in Bermuda.  The March 2001 meeting at which the directors ratified the acquisition of CIT took place in Bermuda, and the interpretation of Tyco's Bye-Laws is governed by Bermuda law.

By contrast, New York has little connection to the underlying events at issue in this litigation.  The meeting of Kozlowski, Gamper, and Walsh to discuss the merger took place in New Jersey, while the January 2002 board huddle took place in Florida.

Tyco argues against the application of the "internal affairs" doctrine, contending that it does not apply in cases like the one at hand in which the director was not serving on the board at the time suit was brought.  Tyco relies on dicta in Edgar that the internal affairs doctrine governs relationships between the corporation and "its current officers, directors, and shareholders."  Edgar, 457 U.S. at 645 (emphasis supplied). The Court's use of that one word is insufficient to require deviation from the ordinary rule.  The policies that underpin the internal affairs doctrine suggest applying that doctrine to an evaluation of conduct undertaken while the defendant was a

director of Tyco.  The state of incorporation maintains the greatest interest in regulating the conduct of corporations and their boards.

Tyco has not shown, in any event, that New York has any particular, much less a strong, interest in Tyco's claims against Walsh.  Tyco cites principally the following contacts with New York in support of its contention that New York law should apply:  Walsh's July 18, 2001 invoice was addressed to Tyco's New York office; (2) Walsh, Kozlowski, and Swartz were prosecuted by the New York District Attorney's Office and were sentenced by New York's courts; (3) the SEC brought a fraud enforcement action against Walsh in New York; and (4) Walsh initiated suit against Tyco in New York state court on claims of indemnification.  Only one of these contacts directly relates to the conduct at issue in this case; all of the litigation occurred after Walsh's receipt and disclosure of the $20 million payment and the board's response.  As for the invoice, although addressed to Tyco's New York office, it was actually paid out of the Pennsylvania bank account of a Florida-based Tyco subsidiary.  It is also worth noting that Tyco previously assented to the application of Bermuda law in a shareholder derivative suit alleging that Tyco's directors failed to disclose and fully investigate the extent of past misconduct by

its board.  In re Tyco Int'l Ltd., 340 F.Supp.2d 94, 96 (D. N.H. 2004).


Duties of a Fiduciary under English and Bermuda Law

Tyco claims that Walsh breached his fiduciary duty to the corporation by failing to disclose and seek board approval for the $20 million payment he received in connection with the CIT acquisition.  Because Bermuda law governs Tyco's claim, it is necessary to outline the duties of a fiduciary under Bermuda law.

Although Bermuda has its own court system, as a British overseas territory it closely follows English law.  See Cromer Finance Ltd. v. Berger, 137 F.Supp.2d 452, 492 (S.D.N.Y. 2001). Turning first then to an examination of English agency law, it is not surprising to discover that the English and American common law of fiduciary duty is largely the same.  As in America, a director is a fiduciary of the corporation and as such owes certain duties to the company:

> The starting-point in general law is that a
> director, as a fiduciary, is not entitled to profit
> from his position.  This rule can be mitigated by
> the consent of the company.  That consent can be
> given in a number of different ways:  either ad hoc
> in a general meeting or, more conveniently, by
> providing a mechanism under the articles by which
> directors can contract with the company and receive
> remuneration.

Guinness PLC v. Saunders, [1990] 2 A.C. 663, 667.  The emphasis

is on the agent's duty to make full disclosure to his principal:

> Stated comprehensively in terms of the liability to
> account, the principle of equity is that a person
> who is under a fiduciary obligation must account to
> the person to whom the obligation is owed for any
> benefit or gain (i) which has been obtained or
> received in circumstances where a conflict or
> significant possibility of conflict existed between
> his fiduciary duty and his personal interest in the
> pursuit or possible receipt of such a benefit or
> gain or (ii) which was obtained or received by use
> or by reason of his fiduciary position or of
> opportunity or knowledge resulting from it.  Any
> such benefit or gain is held by the fiduciary as a
> constructive trustee.

BOWSTEAD & REYNOLDS ON AGENCY 6-056 (18th ed. 2006).  Thus, the Court

of Session in Scotland held that a director of an oil and gas

company had breached his fiduciary duty to the company by

diverting a valuable commercial opportunity to a second gas

company in which he had an interest without first disclosing the

opportunity to the company on whose board he served.  The court

held that the director should have sought the "informed consent"

of the corporation's board before pursuing a business

opportunity for his own benefit.  Commonwealth Oil & Gas Co.,

Ltd. v. Baxter, [2009] S.L.T. 1123, 1138.  The parties have

presented no evidence and this Court has uncovered none

suggesting that Bermuda's courts do not follow these well-

established English law principles.

Walsh has acknowledged that prior to the board's approval of the CIT merger, he "intentionally did not disclose to any of the members of the Board, other than Kozlowski and Swartz, that [he] stood to receive a substantial fee if the transaction was approved."  Walsh pleaded guilty to a violation of New York General Business Law Section 352(c)(6), which prohibits an individual from

> intentionally engag[ing] in fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale, or [making] any material false representation or statement with intent to deceive or defraud, while engaged in inducing or promoting the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities . . . and thereby wrongfully obtain[ing] property of a value in excess of two hundred fifty dollars . . . .

N.Y. Gen. Bus. Law § 356-c(c)(6).

As a fiduciary to Tyco, Walsh had a duty to disclose to Tyco's board that he stood to benefit personally from its approval of Tyco's acquisition of CIT.  Indeed, § 64(7) of Tyco's Bye-Laws requires directors of the company to disclose potential conflicts of interest to the board.  Therefore, Tyco has shown that Walsh breached his fiduciary duty to Tyco.


Defenses to Tyco's Breach of Fiduciary Duty Claim

Walsh does not contest that he breached his fiduciary duty to Tyco.  He vigorously denies, however, that Tyco is entitled

to recovery of any damages from him.  He relies principally on three affirmative defenses:  ratification, waiver, and estoppel. It is only necessary to address the defense of ratification.

Bermuda Law on Ratification

Although Walsh breached his fiduciary duty by failing to disclose his receipt of the $20 million payment, Tyco's board implicitly ratified his breach.  It did so through its public filings and statements signaling approval of the payment, as well as its failure to seek return of the payment until months after learning of it.

Walsh's ratification defense is governed by Bermuda law, which follows English law.  English law recognizes the general principle of ratification, which provides for the retroactive validation of the acts of agents who act outside their given scope of authority.  Ratification can either be expressly given or implied from the conduct of the principal.  An express ratification "is a clear manifestation by one on whose behalf an unauthorized act has been done that he treats the act as authorized and becomes a party to the transaction in question. The express manifestation need not be communicated to the third party or to the agent." Norwich Union Life & Pensions Ltd. v. Strand Street Properties Ltd., [2010] E.W.C.A. (Civ.) 444, 2010 WL 1608533 (citation omitted).

36

Ratification will be implied where

> the conduct of the person on whose behalf the
> unauthorized act has been done, is such as to amount
> to clear evidence that he adopts or recognizes such
> act or transaction and such can be implied from the
> mere acquiescence or inactivity of the principal.
> The adoption of part of a transaction operates as a
> ratification of the whole.

Id. (citation omitted).  To constitute a valid ratification, the

principal ratifying the act must have "full knowledge of what

[the acts in question] were, or such an unqualified adoption

that the inference may properly be drawn that the principal

intended to take upon himself the responsibility for such acts

whatever they were."  Hambro v. Burnand, [1903] 2 K.B. 399, 414-

15 (citation omitted).

     Under English law, the directors of a corporation can

ratify an act entered into on behalf of a corporation, if they

are authorized to approve such an act on behalf of the company.

BOWSTEAD & REYNOLDS at 2-078; see also Reuter v. Electric Telegraph

Co., [1856] 119 E.R. 892, 896.  "It is well established at

common law that, unless a company's constitution otherwise

provides, a board of directors can, within a reasonable time,

ratify the acts of a director or directors who, when they acted,

had no authority to bind the company."  Eastford Ltd. v.

Gillespie, [2010] C.S.O.H. 132, 2010 WL 3766016.  Thus, the

Court of Session held that a resolution of the directors of a

family company could ratify the unauthorized initiation of suit

against one of the directors for his breach of fiduciary duty to
the company.  Id.  Similarly, the Court of Chancery upheld a
board of directors' ratification of an unauthorized allocation
of shares by several directors acting without board approval.
In re Portuguese Consolidated Copper Mines Ltd., [1890] L.R. 45
Ch. D. 16, 27.

Tyco argues that a dishonest breach of fiduciary duty is
incapable of ratification under English law, whether by the
directors or the shareholders.  Tyco relies principally on a
statement from an opinion of the Chancery Division providing
that "[a] breach of duty which is dishonest and involves
misappropriation of property from a company cannot be ratified."
Shaker v. Al-Bedrawi, 2001 WL 825485, at ¶143 (Chancery Div.,
July 26, 2001).  But the Shaker court went on to note in the
next sentence that "[w]here the act consists of an application
of a company's property in a way that might have been intra
vires if done properly, there may be ratification provided that
there is no risk of prejudice to creditors."  Id.  This is
precisely the situation at issue here:  under Tyco's Bye-Laws,
the payment to Walsh could have been approved by the directors
if it had been properly disclosed prior to the consummation of
the CIT transaction.

Moreover, the facts of Shaker could not be more different
than those at issue here.  In Shaker, three Saudi Arabian

38

businessmen formed a company for the purposes of operating an Arab television and radio station in the United States.  The plaintiffs supplied the capital for the business and took a 70% stake, while the defendant Bedrawi managed and controlled the business.  Plaintiffs principally alleged that Bedrawi made a "secret profit" from the sale of part of the business by diverting $6 million in proceeds from the sale for his own personal use, without disclosing the full amount of the sale proceeds to plaintiffs.  Id. at ¶12.  Walsh's failure to timely disclose to the board a payment that was negotiated by the CEO and approved by the CFO of Tyco and that could otherwise have been properly authorized by the board does not begin to rise to the level of deceitful, intentional misappropriation of company property alleged in Shaker.

Tyco further argues that Bermuda law does not permit the board of directors to ratify a fellow director's breach of fiduciary duty, contending that ratification must instead be effected by a majority of shareholders.  Where a director takes action that is beyond the power of the directors and which would ordinarily require the approval of the shareholders, such a breach of duty cannot be cured by ratification of the directors alone.  But where, as here, the company's by-laws permit the directors to approve a grant of special compensation to a director, a failure to secure board approval in advance of

paying such special compensation may be cured by the board's later ratification.

Applying Bermuda Law to Walsh's Ratification Defense

In 2001, when Tyco paid Walsh and his designated charity $20 million in connection with the acquisition of CIT, Tyco's Bye-Laws permitted its board "to grant special remuneration" to a director who "perform[s] any special or extra services" for Tyco.[13]  No later than the January 16, 2002 board huddle, Tyco's directors possessed "full knowledge" of the relevant facts -- the circumstances of the payment to Walsh and the amount of the payment.  Fully informed as to the relevant facts, the board members presented Walsh with a choice:  he could return the payment, or he could keep the money and leave the board.  Walsh chose the latter course of action.  For all he knew when he left the January 16 huddle, the board had allowed him to keep the money on the condition that he resign as director.  Indeed, the board did not take any action after Walsh left the huddle other than refusing to permit Walsh to be renominated to serve on the board at the upcoming shareholders meeting.  No mention whatsoever of the payment was made at the official board meeting

---

[13] The Bye-Laws also permitted directors to receive remuneration for professional services performed for the company.

held on January 20, just a few days after the board huddle at
which the payment was discussed with both Walsh and Kozlowski.

Further, Tyco's proxy statement disclosing the Walsh
payment, filed promptly after the board learned of the payment
at its January 16 huddle, contains no statement that the board
disapproved of the payment or was seeking its return.  Nor does
it reveal that the payment was only reported to the board after
it had already been made.  Rather, the only reasonable reading
of the disclosure is that both the company and the board found
the payment to be appropriate under the circumstances:  the
proxy statement reports that Walsh was "instrumental in bringing
about the acquisition" of CIT and that the $20 million payment
was made in return "[f]or his services" in the transaction.  If
the board had any reservations about the legality or propriety
of the payment, then it would have been expected to disclose
those reservations in the proxy statement, for instance, by
indicating that it had begun an investigation of the payment and
the appropriate course of action to be taken to recover it.  In
addition, the discussion of the Walsh payment is buried on page
19 of the proxy, in the fourth paragraph of a section entitled
"Related Party Transactions."  This is hardly the kind of
treatment that one would expect if the board were disavowing or
even questioning the payment.  Tyco's statements to the press on
January 29, the day following the filing of its proxy, convey

41

similar approbation.  Tyco also reviewed Walsh's press statement prior to its release; the statement contained no mention of any action by the company to seek return of the payment and referred additional inquiries to the company.

Berman's statements in February 2002 in defense of the wording of the proxy statement confirm that the board implicitly ratified the payment.  Berman told Belnick that he was trying to "steer a middle course" in which the "the Board just doesn't ratify, doesn't not ratify."  In other words, the board's press releases and SEC filings would suggest to the public that the board approved of the payment, but the board would not pass a resolution expressly confirming the payment.  This is the very definition of implied ratification:  the board's actions suggested its approval of the Walsh payment without expressly confirming it.

It was not until April 29, 2002, that Tyco's Corporate Governance Committee resolved to explore recovery of the payment from Walsh, and even then it was far from clear that Tyco would choose to sue Walsh in the event he continued to resist repayment.  Boies Schiller was retained to investigate the Walsh payment in May, and suit was only initiated against Walsh on June 17, after Kozlowski had been indicted and had left the company.

To capture the fair inferences to be taken from Tyco's
public statements, it is useful to consider what the board would
have done had it determined at the board huddle to pursue
recovery of the money.  Viewed from that perspective, the record
is devoid of the type of action by Tyco's board that one would
expect if the board had not ratified the payment to Walsh.
Following the January 16 huddle, Tyco's board did not issue a
written statement demanding that Walsh return the payment or
pass a resolution to that effect.  Nor did the board make clear
in its January 28, 2002 proxy statement that it disapproved of
the payment to Walsh or that it was taking action to recover the
payment from Walsh.  Further, Tyco did not retain counsel to
investigate the Walsh payment until May 2002, months after the
disclosure of the payment on January 16.

Tyco argues that the board lacked "full knowledge" of the
material facts surrounding the Walsh payment in January 2002,
and that this lack of knowledge motivated the board's decision
to retain Boies Schiller in May.  The only undisclosed "fact" to
which Tyco points is that Tyco's Form S-4, filed on March 29,
2001, had failed to report the Tyco payment to Walsh and falsely
stated that Tyco had not paid any type of finder's fee in
connection with the CIT acquisition.  Of course, had they
reflected on this fact, the directors would have understood at
the January 16, 2002 board huddle that the company had not

43

publicly reported the payment to Walsh in its SEC filings
related to the CIT acquisition.  But ratification does not
require that the directors have "full knowledge" of the legal
consequences of an act; rather, it requires that the directors
be fully informed as to the facts at issue, as they clearly
were.  None of the directors dispute that they were informed at
the January 16 huddle that Walsh was paid a $20 million finder's
fee in connection with the CIT acquisition and that they had not
been advised of this payment at the time they approved the CIT
acquisition.[14]  In any event, one of the board members, Berman,
was exquisitely aware of the disclosures in the Form S-4 filed
in connection with the CIT transaction, and wanted to avoid
flagging for the public any potential liability that the company
might have from its omission in that filing of a description of
the payments to Walsh.

Tyco also asserts that its board lacked the "clear intent"
necessary to find ratification of the Walsh payment.  Tyco notes
that its former directors testified in their depositions that
they did not ratify the Walsh payment at the January 16 session.
These after-the-fact assertions are insufficient to overcome the
historical record that in January 2002, with full knowledge of
the payment, the directors decided not to pursue recovery of the

_____

[14] It is generally accepted that ratification, once accomplished,
cannot be revoked.  See, e.g., BOWSTEAD & REYNOLDS at 2-097.

$20 million once Kozlowski advised them that he considered the
issue a referendum on his management of Tyco.  The board's
public filings and failure to take any action for months to
force return of the $20 million constitute an implied
ratification of the payment to Walsh.  Indeed, the action by the
Corporate Governance Committee in late April 2002 to initiate an
investigation is best seen as a reaction to the firestorm of
negative publicity that was descending on Tyco over Kozlowski's
management generally.


Tyco's Claim of Inducing Breach of Fiduciary Duty

        In addition to arguing that Walsh breached his fiduciary
duty to the company, Tyco also claims that Walsh induced
Kozlowski and Swartz's breaches of fiduciary duty.  Tyco asserts
that Kozlowski and Swartz breached their duties as fiduciaries
by authorizing and concealing the payment to Walsh, and that
Walsh "knowingly participated" in the breach by agreeing not to
disclose the payment to the board.  English law recognizes the
tort of inducing a breach of fiduciary duty, see, e.g., Derby &
Co. Ltd. v. Weldon, [1989] 1 W.L.R. 1244, 1255, but Walsh
responds that Bermuda law does not.[15]

_____

[15] Tyco argues that New York law, rather than Bermuda law,
applies to its claim that Walsh induced Kazlowski and Swartz's
breaches of duty.  Tyco relies heavily on this Court's decision
in Cromer Finance Ltd., 137 F.Supp.2d 452, for the proposition

It is unnecessary to decide if Bermuda law has departed from its customary adherence to English law since the board's implied ratification of the payment to Walsh also governs any claim that Walsh aided and abetted Kozlowski and Swartz in their breaches of duty.  Regardless of whether Kozlowski and Swartz breached their duties to the board by authorizing and failing to disclose the payment to Walsh, the board retroactively validated the Walsh payment due its failure to take action and issuance of approving public statements after learning of the payment at its January 16 session.

---

that the internal affairs analysis does not apply to its claim that Walsh induced Kozlowski and Swartz's breach of fiduciary duty.  In Cromer, investors in an off-shore investment fund brought suit against the fund's Bermuda-based auditors for aiding and abetting both breach of fiduciary duty and common law fraud, among other causes of action.  This Court held that New York law, rather than the law of the state of incorporation, Bermuda, governed the investors' aiding and abetting claims because the fraud at issue was "created and perpetuated" in New York.  Id. at 492.  The fund in Cromer maintained "no offices, employees or operations of its own" in Bermuda; rather, the fund's assets were held in custody in New York and all investment decisions were made in New York from the offices of the fund's investment manager.  Id. at 461.  Thus, Cromer is readily distinguishable from the case at hand:  while the Cromer fund maintained the most minimal of contacts with its state of incorporation, the pivotal board meeting in this case took place in Bermuda, Tyco's state of incorporation, and contacts with the state of New York are insignificant.

Conversion

Tyco also asserts a claim of conversion against Walsh for wrongfully obtaining the $20 million payment and diverting those funds to his own use.  Bermuda law applies to Tyco's conversion claim for the reasons outlined supra, namely that a Bermuda corporation is seeking recovery of the money and New York lacks a compelling interest in the application of its law to Tyco's claims.  Further, the parties have not shown any divergence between the Bermuda and New York law of conversion.

Under English law, conversion is "any intentional dealing with another's goods or any act of dominion, inconsistent with the rights of the true owner, whether or not the converter knows of those rights."  Kuwait Airways Corp. v. Iraqi Airways Co., [2002] 2 A.C. 883, 1071.  Thus, the essence of the tort is the deprivation of the owner's use and possession of the property.

Because Tyco's board ratified the payment to Walsh, the $20 million cannot be considered Tyco's property for purposes of the conversion analysis.  Ratification by its nature creates authority which relates back to the time of the act ratified. Thus, because Tyco's board ratified the payment to Walsh following its January 16 session, Walsh possessed the funds on valid authority from the board.

Tyco's Equitable Claims

    Tyco asserts equitable claims against Walsh for
restitution, unjust enrichment, and constructive trust and seeks
recovery of interest on the $20 million payment to Walsh.  These
claims also fail due to the board's ratification of the payment
to Walsh.  Bermuda law also governs Tyco's equitable claims,
since under the interest analysis performed <u>supra</u>, Bermuda's
interest in applying its law is greater than that of New York.

    The basis of Tyco's equitable claims is that "where an
agent holds money which belongs in law or equity to his
principal, any interest earned in respect of that money belongs
to the principal, and the agent must account to him for it."
Bowstead & Reynolds at 6-100.  Tyco argues that Walsh wrongfully
obtained the $20 million payment; it follows that any interest
earned on the $20 million during the period in which Walsh was
in possession of the payment would also belong to Tyco.  Tyco's
equitable claims fail for the same reason as its claim of
conversion, namely, that because ratification supplies the
missing authority for the act of an agent, Walsh validly
possessed the $20 million during the period between his receipt
of the funds in July 2001 and his return of the payment on
December 17, 2002.

    Moreover, Tyco's resort to equitable principles is
particularly unwarranted here.  Tyco chose to pay Walsh and,

when it learned of the payment, Tyco's board made a choice to
acquiesce in that decision.  To the extent the trial evidence
illuminated the context in which those two choices were made,
the reasons behind the choices have been outlined above.  In the
case of the board, it made a decision on January 16, 2002 not to
compel Walsh to repay either the $10 million he had received or
the entire $20 million that Tyco had paid, and not to confront
Kozwalski's leadership and decision-making authority.  The
board's complicity at that time undermines its resort to equity
once circumstances have changed and it has had occasion to
question the wisdom of its earlier decision-making.  The board
did not anticipate the public outcry over the payment to Walsh
or Kozlowski's disgrace.  But, its reconsideration of the
choices it first made does not suggest that a court sitting in
equity may or should ignore the evidence of those starkly
different choices, choices made when Kozlowski was still in
charge and Tyco's board valued him.


Damages Generally

     Having failed to prevail on its claims, Tyco is not entited
to any damages or relief.  Tyco seeks consequential and punitive
damages on its claims of breach of fiduciary duty, inducing
breach of fiduciary duty, and conversion, and it seeks interest
alone on its equitable claims of restitution, unjust enrichment,

and constructive trust.  Because the parties have litigated the issue of damages extensively, the remainder of this Opinion contains the rulings that would have been made on the damage issues had Tyco prevailed on any of its claims.

Tyco would not be entitled to punitive damages under Bermuda law even if the board had not implicitly ratified the payment to Walsh.  As a general rule, the English courts do not award exemplary or punitive damages in civil cases.  See Rookes v. Barnard, [1964] A.C. 1129, 1226; see also MCGREGOR ON DAMAGES 11-003 (17th ed. 2003).  There are exceptions to the general ban on punitive damages for limited categories of cases, none of which are implicated here.  MCGREGOR at 11-017 to 11-030.

Further, had there been no ratification of the payment to Walsh, Tyco would still not be entitled to consequential damages resulting from the Franklin litigation.  Tyco claims that because the Franklin plaintiffs sold their Tyco stock before the allegations against Kozlowski came to light, at a time when only the payment to Walsh was known, the costs associated with defending this opt-out suit are directly attributable to Walsh's breach of fiduciary duty.  This assertion rests on the application of the doctrine of loss causation to the damages sought in the Franklin litigation.  See, e.g., In re Omnicom Group, Inc. Sec. Litig., 597 F.3d 501, 509-10 (2d Cir. 2010).

Tyco has failed to show, however, that the disclosure of the Walsh payment caused the filing of the Franklin litigation.

The Franklin lawsuit was one of several opt-out suits filed after the settlement of the consolidated securities litigation against Tyco.  Like the consolidated complaint, the Franklin complaint asserted all manner of alleged misconduct by Tyco's board, with the payment to Walsh as only one among a slew of other alleged breaches of fiduciary duty by the board.  Tyco has not supported its claim for reimbursement of its attorneys fees incurred in defending the Franklin lawsuit with an expert report or any persuasive analysis explaining why the filing of the Franklin suit some six years after the disclosure of the payment to Walsh was caused by that disclosure as opposed to the general frenzy of litigation that followed the indictment of Kozlowski, and a desire by the Franklin plaintiffs and their attorneys to receive a settlement with Tyco on more favorable terms than the class.  While Tyco contends that the Franklin plaintiffs were motivated to opt out of the consolidated class action because of the comparative strength of their § 11 claim, that assertion, even if it had been proven, would not substantially assist Tyco. The Franklin complaint identifies a host of misleading disclosures and omissions in the Form S-4 that forms the basis of plaintiff's § 11 claim, including statements in Tyco's Forms 10-K and 10-Q that are incorporated by reference in the Form S-

4.[16]  Thus, the Walsh payment is merely one of the omissions cited by plaintiff.  Clearly the cost of defending the Franklin lawsuit cannot be attributed to Walsh alone.

Tyco also claims interest on the $20 million payment during the period between Walsh's receipt of the payment in July 2001 and his return of the payment on December 17, 2002.  Tyco further seeks the interest accumulated on that interest between December 17, 2002 and the date of trial.  The Bermuda statutory rate of 7% applies to Tyco's claim for interest on the Walsh payment.  Further, since the decision of whether to award interest is discretionary under Bermuda law, see, e.g., BskyB Ltd. v. HP Enters. Servs. Ltd., [2010] E.W.C.H. 862, 2010 WL 2569123, if this Court had found that Tyco had prevailed on its claims it would have awarded Tyco interest at the rate of 7% for only the period before Walsh repaid the $20 million, and not the interest on interest for the eight year period following 2002.


Attorneys' Fees

Tyco also seeks an award of attorneys' fees in the event that it prevails on its claims.  Walsh argues that New York law

---

[16]  Indeed, before settling the Franklin litigation, Tyco moved to dismiss that portion of the § 11 claim premised on the Walsh payment because the plaintiff had not and could not allege that there was any agreement between Walsh and Kozlowski to pay Walsh until after the Tyco merger with CIT closed.

applies to Tyco's claim for attorney's fees, and that under New York law each party bears his own costs of litigation.

Following English practice, Bermuda law customarily awards attorneys' fees to the prevailing party, although the court retains "wide discretion" in determining whether an award of fees is appropriate under the circumstances of each case.  See In re Tyson, 433 B.R. 68, 96 n.50 (S.D.N.Y. 2010).  New York choice-of-law analysis would treat the Bermuda attorneys' fees rule as substantive, rather than procedural, and thus New York would apply the Bermuda rule here since Bermuda law governs Tyco's claims.  Id. at 97.  Thus, if Tyco had prevailed it would be entitled to an award of attorneys' fees under Bermuda law, subject to the court's discretion.


Conclusion

Following a bench trial on October 12-13, 2010, Tyco's claims for restitution, breach of fiduciary duty, conversion, unjust enrichment, constructive trust, and inducing breach of

fiduciary duty are denied.   The Clerk of Court shall enter

judgment for Walsh and close the case.


     SO ORDERED:

Dated:     New York, New York
           October 20, 2010


                               _____
                                  DENISE COTE
                     United States District Judge